MEMORANDUM OF DECISION
The Department of Children and Families (DCF) has submitted to the court for its approval a permanency plan which recommends long term foster care for Mackenzie R., a child committed to its care. Laurie B., who was the legal guardian of Mackenzie R. prior to her commitment to DCF, objects to the permanency plan and asks the court to require DCF to make reasonable efforts to reunify Mackenzie R. with her. The unresolved issues before the court are whether a former legal guardian has standing to object to a permanency plan and whether DCF has a duty to make reasonable efforts to reunify a minor child with a former legal guardian. CT Page 6884
Mackenzie R. is presently twelve years old. Laura B. was awarded guardianship of Mackenzie through West Haven Probate Court on August 22, 1994. Mackenzie R. was initially committed to the custody of DCF on December 10, 1997. Her commitment was extended an additional twelve months on March 31, 1999. The whereabouts of Mackenzie's biological mother is currently unknown and the identity of her biological father is unknown.
DCF claims that Laurie B. lacks standing to object to the permanency plan for Mackenzie R. DCF argues that Laurie B. was removed as the legal guardian for Mackenzie R. by the court's commitment of the child to DCF and, since guardianship is a judicially created relationship, no legal relationship currently exists between Laurie B. and Mackenzie R. which provides her with standing. DCF also asserts that the plain language of General Statutes § 46b-129 (k)(2) limits reunification efforts to parents and it can not be read to include former legal guardians.
Laurie B. contends that she has standing to be heard on the proposed permanency plan because she retains a real interest in the legal matters that remain before the court. Laurie B. also maintains that DCF has a continuing duty to make reasonable efforts to reunify Mackenzie R. with her because the court retains the statutory authority to revoke the child's commitment to DCF and place the child with her.
With respect to the first issue, the court concludes that former legal guardians have standing to be heard on proposed permanency plans that concern children for whom they had custody prior to their commitment to DCF.
"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) (Citations omitted.) Community Collaborative of Bridgeport. Inc.v. Ganim, 241 Conn. 546, 552 (1997). "Standing concerns the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (Internal quotation marks omitted.) (Citations omitted.) Med-trans. Inc. v. Department of Public Health,242 Conn. 152, 160 (1997). CT Page 6885
As the former legal guardian of Mackenzie R., Laurie B. has a real and direct interest in the subject matter of the controversy before the court. The issue before the court is approval of the plan proposed by DCF for the permanent care and custody of Mackenzie R. Pursuant to General Statutes § 46b-129 (k)(3), the court may approve as part of the permanency plan a revocation of the child's commitment to DCF and placement with the guardian. Laurie B's interest in seeking a return of custody and guardianship of Mackenzie R. will be directly affected by the permanency plan hearing.
Laurie B.'s interest is also within the zone of interests sought to be protected by the statutory provisions in question. The statute specifically requires that notice be provided to the guardian of the time and place of the court hearing on DCF's motion for review of a permanency plan. General Statutes §46b-129 (k)(1). Implicit within this statutory right to notice is the right to be heard at the court hearing to review the permanency plan. The right to notice is an empty gesture if it is not accompanied by the right to be heard.[2]
The remaining issue is whether DCF has a statutory duty to make reasonable efforts to reunify a child with a legal guardian after that child has been committed to the care of DCF. The resolution of this question rests upon the appropriate construction of the statutory provision at issue. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) (Citations omitted.) Wright Brothers Builders.Inc. v. Dowliua, 247 Conn. 218, 226 (1998).
Every venture into the realm of statutory interpretation must begin with a consideration of the language of the statute. General Statutes § 46b-129 (k)(2) explicitly provides that at the permanency plan hearing "the court shall determine whether it is appropriate to continue to make reasonable efforts to reunify the child or youth with the parent." (Emphasis supplied.) Because the language of the statute fails to expressly extend the duty of reunification to a legal guardian, the wording of this statutory provision provides strong support to DCF's position that none is CT Page 6886 required.
Although the search for legislative intent begins and often ends with an examination of the language of the statute, the court is not hamstrung by the overt statutory wording when it is manifest that the words chosen do not fully and accurately express the legislature's intent. "Because our fundamental objective in construing a statute is to ascertain and give effect to the apparent intent of the legislature, we will not undertake an examination of [a statute] with blinders on regarding what the legislature intended it to mean. Accordingly, our analysis of [a statute] is not limited solely to the words of the statute. Instead, we must also look to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject mater." (Internal quotation marks omitted.) (Citations omitted.) Derwin v. State Employees RetirementCommission, 234 Conn. 411, 419 (1995). See also Shew v. Freedomof Information Commission, 245 Conn. 149, 166-167 (1998).
The words of a statute do not exist in a vacuum and our Supreme Court has recognized that they should not be interpreted as if they do. "Where a court possesses clues to the meaning of a statute, there certainly can be no rule of law which forbids [their] use, however clear the words may appear on superficial examination." (Internal quotation marks omitted.) (Citations omitted.) State v. Golino. 201 Conn. 435, 442 (1986). See alsoState v. Albert, 50 Conn. App. 715, 720 (1998). "When it is clear that the intent of the legislature conflicts with the literal and precise language of a statute, it is appropriate for this court to construe the statute . . . in furtherance of the legislature's purpose and objectives." Sienkiewicz v. Sienkiewicz178 Conn. 675, 683 (1979).
The other indicia of legislative intent — the statute's legislative history and circumstances surrounding its enactment, the legislative policy the statute was designed to implement, and its relationship to existing legislation — all evidence a legislative design to include an obligation for DCF to make reasonable efforts to reunify a child with his former legal guardian.
Connecticut has historically modeled its child protection laws on the federal statutes in this area in order to insure the CT Page 6887 receipt of federal funds. Title IV-E of the Social Security Act,42 U.S.C. § 670-679, establishes a federal reimbursement program for certain expenses incurred by states in administering foster care and adoption services. The Act provides that a state will be reimbursed for a percentage of its expenses when the state satisfies the requirements of the Act. Title IV-E of the Social Security Act specifies that in order to be eligible for federal reimbursement a state must have an approved plan that provides that "reasonable efforts shall be made to preserve and reunify families." (Emphasis supplied.) 42 U.S.C. § 670 (a)(15).
In 1997, the United States Congress enacted the Adoption and Safe Families Act of 1997, Public Law 105-89, 111 Stat. 2129. The Adoption and Safe Families Act of 1997 made significant changes to Title IV-E of the Social Security Act. In order to insure the continued receipt of federal funds, the Connecticut General Assembly endeavored to modify our child protection statutes to conform with the changes to the federal statutes made by the Adoption and Safe Families Act of 1997. As a result, the General Assembly approved No. 98-241 of the 1998 Public Acts which significantly revised General Statutes § 46b-129.
One of the alterations was to add several provisions which require DCF to file a permanency plan concerning the long-term placement of the child and which govern court review of the plan. See Section 5 of Public Act 98-241. During the course of adding these provisions, the legislature changed slightly the wording of the sentence on reunification. Prior to the enactment of Public Act 98-241, the sentence read: "At such hearing, the court shall determine the appropriateness of continued efforts to reunify the child or youth with his family." (Emphasis supplied.) See General Statutes (Rev, to 1997) § 46b-129 (e) Public Act 98-241 revised this sentence to state: "At such hearing, the court shall determine whether it is appropriate to continue to make reasonable efforts to reunify the child or youth with theparent." (Emphasis supplied.) See General Statutes (Rev. to 1999) § 46b-129 (k)(2)
The clear and stated purpose of the revisions made by Public Act 98-241 was to insure that Connecticut's child protection statutes complied with the changes mandated for the receipt of federal funds by the passage by the United States Congress of the Adoption and Safe Families Act of 1997. See 41 H.R. Proc. Pt. 3, 1998 Sess. P. 4146, remarks of Rep. Diamantis and 41 S. Proc. Pt. 9, 1998 Sess. P. 2665, remarks of Sen. Williams. The wording CT Page 6888 change from "family" to "parent" in the sentence on reunification efforts was not mandated by The Adoption and Safe Families Act. In fact, it is contrary to the requirement of Title IV-E which still mandates that "reasonable efforts shall be made to preserve and reunify families." (Emphasis supplied.) 42 U.S.C. § 670
(a)(15). Since the term "families" suggests reunification efforts that extend beyond biological or adoptive parents, a literal reading of the revised sentence on reunification efforts contained in General Statutes § 46b-129, as advocated by DCF, could place Connecticut in danger of being found out of compliance with the requirements of Title IV-E.[3]
The Adoption and Safe Families Act requires that states receiving federal funds hold permanency hearings in court every twelve months to determine the permanent living arrangement for the child. The permanency plan to be reviewed by the court must include "whether, and if applicable when, the child will be returned to the parent . . ." Section 302 of the Adoption and Safe Families Act. Title IV-E of the Social Security Act however defines parents so as to include legal guardians. "The term `parents' means biological or adoptive parents or legal guardians, as determined by applicable state law." 42 U.S.C. § 675
(2). It appears that the Connecticut General Assembly borrowed the language surrounding permanency plans contained in the federal act but inadvertently neglected to include the statutory definition of "parent."[4] There is nothing in the legislative history surrounding Public Act 98-241 which indicates that the legislature intended to restrict reunification efforts to biological or adoptive parents or to preclude attempts to reunify a child with his former legal guardian.
Another change made by Public Act 98-241 to General Statutes § 46b-129 provides further evidence that the General Assembly did not intend to define parent to preclude legal guardians. Section 5 of Public Act 98-241 adds a provision to § 46b-129
which requires ex parte temporary custody orders or orders to appear issued by the court to include a conspicuous notice to respondents written in clear and simple language advising them of their rights. The information which the statute mandates be in the notice speaks only in terms of "parents", e.g. "the hearing is an opportunity to present the parents' position concerning the alleged facts." General Statutes § 46b-129 (b). (Emphasis supplied.) However, respondents may include parents or legal guardians. General Statutes § 46b-129 (a). Obviously, the legislature did not intend that only parents, and not legal CT Page 6889 guardians, be given plain language notice of their rights.
The statutory interpretation proffered by DCF would lead, in many cases, to anomalous results. It is this court's experience in abuse and neglect cases that legal guardians are often close relatives who have provided long term care for the child. In many cases, the legal guardian is the "psychological parent" for the child and frequently the only caretaker the child has ever known. Our Supreme Court has recognized that the practical definition of what constitutes a child's family has undergone dramatic change. "[T]raditional models of the nuclear family have come, in recent years, to be replaced by various configurations of parent, stepparents, adoptive parents and grandparents, and we should not assume that the welfare of children is best served by a narrow definition of those whom we permit to continue to manifest their deep concern for a child's growth and development." (Internal quotation marks omitted.) (Citations omitted.) Doe v. Doe,244 Conn. 403, 441 (1998).
Limiting DCF's reunification obligation to parents would mean that DCF would be required to consider efforts to reunify a child with a parent who has not cared for a child for many years and whose whereabouts may in fact be unknown but not assess reunification with a legal guardian who has been the long and loving caretaker for the child. "When two constructions are possible, courts will adopt the one which makes the statute effective and workable, and not one which leads to difficult and possibly bizarre results." (Internal quotation marks omitted.)Grigerik v. Sharpe, 247 Conn. 293, 307 (1998).
General Statutes § 46b-129 (k)(2) should be construed so that the term "parent" includes a legal guardian. So construed, the court, at a hearing to review a permanency plan for a committed child, is required to determine whether it is appropriate to continue to make reasonable efforts to reunify the child with the parent or guardian.
BY THE COURT
Jon M. Alander, Judge